May it please the Court, my name is Anthony Watson. I'll be appearing on behalf of the petitioner. I would like to reserve two minutes for rebuttal, Your Honor. Okay. The petitioner in this matter seeks a review of the March 27, 2006, order of the Board of Immigration Appeals. That order affirmed and adopted the IJ's decision that found the petitioner removable based on an adverse credibility finding. There are two issues in this case. One is the adverse credibility finding and one is a violation of his due process rights. I would like to give the Court a quick overview of this case. Mr. Nuru is from Nepal. He came, he joined the Nepal Congress Party in 1996. He acted as an active member during that time. Just one second, counsel. I'm just checking my notes here. I don't find any reference to the allegation of due process violations. Is that a new claim? No, it's not a new claim, Your Honor. It was actually in the brief. On the opening brief? Yes, Your Honor. Okay. Go ahead. It actually involved an issue with The interpretation? Yes, Your Honor. Interpretation and the assessments records. So he was an active, can I continue? Please. Mr. Nuru was an active member of the Nepal Republic, I mean the Nepal Congress Party. Between 1996 when he joined the party and 2001 and 2000, he had no problems. However, between 2000 and 2002, he encountered a lot of problems from the Miasis. The Miasis, they're a group of militants who advocate communism in that very country. Going back to the adverse credibility finding in this case, we feel that the immigration judge made a couple of errors. First of all, the immigration judge based his credibility finding on minor inconsistencies and not go to the heart of the claim. The petitioner was found not to be credible because he stated that he was an active member of the NCP, which is the Nepalese Congress Party. But yet, when asked about the number of seats, he made a couple of mistakes. How about where he didn't remember the ceasefire agreement or 12,000 party members had gone to jail or the massacre of the royal family? That's only normal based on his level of intelligence. I said that's only normal based on his level of intelligence. He's a functional illiterate. He had very little education. So he didn't know the important events of what seemed to be very important, what had happened in this party that he was involved with. He knew some events, but he didn't know the very important events. I don't understand not remembering how many seats in Congress somebody has. I'm not sure most Americans can say how many seats there are in Congress. But if 12,000 members of your political party are put in jail or your leaders are massacred, you might remember that. To a certain extent, Your Honor. All right. May I continue? Yes. Thank you. In Mendoza and Minerva, which was decided in this court, Your Honor, they established that minor consistencies on the record that do not relate to the basis of an applicant's fear of persecution, go to the heart of the asylum claim or reveal anything about an asylum applicant's fear for safety, are insufficient to support an adverse grievance in finding. Secondly, the immigration judge was of the opinion that the petitioner was not credible because at his individual hearing the petitioner included facts that had not earlier been mentioned at his asylum hearing or were not mentioned in his declaration. It's been well established in the Ninth Circuit that an applicant's credibility is not lacking in credibility because it includes details that are not set forth in the asylum application. The petitioner in this matter merely elaborated on past events and was not inconsistent with his written declaration. Thirdly, the immigration judge in this matter relied heavily on the assessment of an asylum officer who was not available for cross-examination. Despite the fact that certain facts in assessment were inconsistent and there was an immigration fraud issue involved with a gentleman called Butabasi who had filed 3,000 fraud claims, we are of the opinion that the judge was biased. And from the outset of the ---- What does Mr. Butabasi have to do with this case? Well, if you look at the transcripts, if you look at the records from page, I think, in about 10 or 15 pages, it was all about Mr. Basi and who prepared the application, when the application was prepared. But he was not involved in this case, right? He wasn't involved, but they should have subpoenaed him because the respondent, I mean, the petitioner at the time testified to the fact that Butabasi actually helped him prepare the application at some point, but he wasn't very sure because they had represented to him that Butabasi was an attorney. And at some point, there were two applications out there, one application ---- two applications that were identical. So the issue was which one was genuine. After getting in contact with DHS, they confirmed that the petitioner in question wasn't under investigation. Going back to the due process violation, both at the asylum interview hearing and at the immigration courts, incompetent translators, interpreters, I mean, sorry, strike that, sorry about that. At the asylum hearing and the immigration court hearing, the attorneys, what am I saying? Sorry about that. At the asylum interview hearing, a competent interpreter wasn't provided. And at the court hearing, a competent interpreter wasn't provided. As a result, a lot of mistakes were made on the record, and these mistakes were inferred to my clients. This should be found to constitute a due process violation in that it deprived the petitioner of a full and fair hearing. This court in Barnes held that aliens are entitled to procedural due process protection in immigration court proceedings, including the right to respond to the allegations of the INS and to have a reasonable opportunity to present evidence on their own behalf. In that hearing you're talking about, I understood how your client indicated he spoke Hindi, and that was the interpreter that was brought, and that the asylum officer pursued this issue in depth to make sure it was being translated properly. Well, apparently he requested a Nepalese interpreter. Right. And then they couldn't find one. And his attorney provided somebody who said he spoke Hindi. Right. However, he did sign the acknowledgment form stating that the interpreter spoke Hindi to him at the beginning of the interview. But during the interview, he found out that the interpreter wasn't proficient in Hindi and actually spoke to him in Punjabi. So that became an issue. Do you want to save? Yes, Your Honor. My colleague has a question for you right now. Do you want to save your rebuttal time? Yes, thank you. Very good. Clear from the government. Good morning. May it please the Court. My name is Jared Dolan, and I represent the Attorney General in this case, asking this Court to affirm Immigration Judge's adverse credibility finding because that finding rested on substantial evidence. It's fair to say... What was the evidence? Your Honor, the evidence in this case rested on four inconsistencies and some trouble with the documents. And those inconsistencies or omissions in the documents went to the heart of Petitioner's case, that case being that he was politically active in the Nepalese Congress Party, and that because of that activism, he was persecuted by the Maoists. And I think this case becomes easier for the Court once this Court accepts, excuse me, accepts the assessment to refer and the asylum notes as credible evidence. And this Court has guidance to do so in the Singh case. I'll have to be a little more precise. There's a lot of Singh cases. That's at 403 F. 3rd, 1081. And in that case, this Court didn't accept the assessment to refer because there were things that were not present there that are present here. In that case, the assessment to refer wasn't admitted because there was no record of the questions asked and the answers provided. But I'm not sure you've answered my question. What I wanted to know is specifically what things were said or not said that affected his credibility. Your Honor, I think we'll start with the renunciation event. In his direct testimony before the immigration judge, the petitioner said for the first time that he led in June of 2001 a group of Maoists to renounce Maoism. One of them was a commander. He convinced them to go to the central district office and turn in his firearm. And he stated that was the reason he was attacked both in August of 2001 and in February of 2002. That was the first time that he stated that, and that went to the heart of his claim. He was asked on cross-examination, why didn't you say this in your asylum application? He said that he did, but that it wasn't translated and it didn't make it all the way through. He was then asked, well, why didn't you tell the asylum officer? And he said that he wasn't asked. When he was pointed out through the questions and answers that he was asked why he was attacked in August of 2001, he said that he just didn't think of it. This is an important event. In fact, the petitioner said that it was actually announced on the radio. And the fact that he omitted this from his application, that the central reason that he was targeted by the Maoists was this renunciation event, goes to the heart of his claim, the heart of his claim that he was persecuted because of his activities on behalf of the Nepalese Congress Party. Is there any case law that suggests that when an I.J. uses an assessment report as the basis of cross-examination, that the assessment officer has to be made available for cross-examination by the applicant's attorney? Not that I've found, although that was one of the factors in Sing, because there the assessment officer was not available. However, here there was a proffer made that the assessment officer would have had no independent recollection of the events. Also, unlike in Sing, there were other factors here that were not present there. There was an interpreter. There was an oath. And there was a detailed record of the questions asked and the answers provided. There were other factors as well. But going to the interpreter issue, this isn't an example of a case where the assessment, the asylum officer said, what's your name? And he said, my birthday is September 2nd, 2001. This is a case where the assessment officer repeatedly went into the details of the claim. When the petitioner said, well, I used to go out into the community and speak for up to two hours, trying to convince people to renounce Maoism and join the Nepalese Congress Party, the assessment officer, when you said two hours, what did you say for two hours? Well, I said this. And there was a lot of detail there. Does the record indicate whether the Applicant's Counsel had a copy of the assessment record or was made available to him during the hearing or previous to the hearing? Yes, Your Honor. That's on page 140, where it is said that it was provided to both the lawyer and it was provided to the petitioner and it was read to him prior to him being asked questions on that matter. And under the rules, would counsel or petitioner have had an opportunity or the right to compel the attendance of the assessment officer at the hearing had they deemed it important to do so? I don't know the answer to that, Your Honor. I do know that he said that he wanted the assessment officer there and the judge said, well, there's been a proffer that he would have had no independent recollection of this matter. I know how he's prepared. I've heard lots of testimony on this. And he denied that request. And what was the response of the petitioner to that, if anything? So be it. I mean, the judge ruled and they went forward. The other important thing to notice about this is there are cases where, such as in Singh, the petitioner didn't have the opportunity to respond, where it was kind of a sandbag operation, where it was introduced into the record and then there was just a ruling. Here, there was no confrontation like cross-examination, capital C. But the petitioner was certainly confronted with the inconsistencies. And how long before the hearing was the counsel for the petitioner given a copy of the assessment officer's information or notes? I could not find that in the record, Your Honor. Okay. Certainly far enough in advance of the hearing where it was able to be read to the petitioner in his native language. Okay. Other than that, I could find nothing. Okay. That's one inconsistency. The other inconsistency that was relied upon by the immigration judge was the political issues which Judge Hogan mentioned. And certainly the difference between the congressional, parliamentary regime, I mean, that's not, that's a mistake many of us could make. I was just trying to think how many people are in the House of Representatives. And I think I know, but if I was under cross-examination, I could certainly forget. But this goes beyond that. You know, he claimed to be an active member of the Nepalese Congress Party that went out into the community, that made these, you know, hour, two-hour speeches trying to convince people to renounce Maoism and was apparently successful in doing so. But he had no sense of the history of the party. He didn't know the pertinent events. And his level of explanation was just a really surface level. Counsel for the petitioner has mentioned Mr. Bossie. Of course, we're very familiar with Mr. Bossie in a wave of cases that have come through this Court. What role did Mr. Bossie allegedly play in the preparation of documentation here that, at least in the view of the government, played a role in his case? Your Honor, it appears that that's who Petitioner went to. I mean, the record isn't entirely clear. I just read the portion of it, and it seemed that that's who he went to. That's who helped prepare the application. There was a previous application that was similar. Is that correct? Yes, Your Honor. And that application is the Mr. Nuri's application is at page 287 of the record. The fake application is partially in the record, the first page, at 248. And unfortunately, it appears the second page of that application didn't make it through. And when the Petitioner, Mr. Nuri, was questioned about that, what did he say as far as Mr. Bossie's role and what the truth of the matter was? I don't know anything. I'm paraphrasing. I don't know anything about the fraud, but this is my true story. Okay. And so – and it's unfortunate that we don't have the entire other application that was similar, but it's notable that it was an entirely boilerplate that was identical. For instance, on page 248, paragraph 4, that's when it starts talking about, in this other application, which is almost identical to the Petitioner's application, that this person also went into the communities, always spoke against the militancy, always spoke against the Maoists, went into the villages. I mean, they're really remarkably identical. That being said, I think the immigration judge took the precisely appropriate role and said, this is an issue. That being said, here's the Petitioner's story and treated it like any judge would. You know, I'm going to look at this a little more closely than I might otherwise. And does the record indicate what weight the immigration judge placed on the role that Mr. Bossie may have played in concocting the story, if that's what it was? It does not, Your Honor. It simply says, it recites the facts as the immigration judge found them and then said simply, be that as it may, and went into the Petitioner's story. And as I said, I think that's appropriate because the Petitioner claimed it to be his true story. It was appropriate to probe his true story and look to see if it was found by substantial evidence and when it was, when he found the inconsistencies and omissions, that was a proper basis   And I think that's the only thing that Mr. Bossie did not do was to decide whether the Petitioner's case went to the heart of his claim, and this Court should affirm that holding. Okay. Any other questions, gentlemen?  Thank you, Your Honor. Mr. Dolan, we'll hear rebuttal then from counsel for Mr. Nuri. Your Honor, in relation to your question about when the assessment record was given, the record was given to counsel on the day of the individual hearing. How long was the assessment? I wasn't counsel of records. I haven't seen the assessments. But normally in these situations, I think they're about three or four pages. Okay. So it's something that usually these hearings, you've got a whole bunch of people in the room. When did this hearing proceed, toward the end, toward the middle, toward the beginning? Do you have any idea? Actually, it was when I think it was at the beginning. It was at the beginning because for the greater part of the hearing, the first part of it, as I said earlier, it was all about Mr. Bossie. Counsel of record at that time objected to the admission of that document based on the matter of S. Right. But it was still admitted, Your Honor. Okay. But he did have a copy of that assessment? Yes, Your Honor. Okay. What is the standard under which we review the credibility finding? Say that again? What is the standard under which we review the credibility finding? Give me a second. How do you read it? It must be supported by specific and cogent reasons, and the reasons set forth must be substantial and be a legitimate nexus to the claim. Do we have to find that it would be a very unlikely that the credibility finding would be wrong? Can you say that again, Your Honor? No, that's right. Go ahead. Okay, thank you. I think actually we've completed the time. Okay. So we thank you very much for your presentation. Thank you. The case of Nury v. Holder is submitted.
judges: Hogan, Hug, Smith M.